[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
CT Page 3947
In the first action Robert and Richard Tulisano bring suit in three counts for breach of contract. Defendants have filed their answer and a counterclaim for the return of a deposit made in connection with said contract.
The second action is brought by and concerns the stakeholder of the deposit.
Facts
Philip Schonberger (Defendant) is a real estate developer. In 1997, he was looking for a commercial site that would meet the needs of a potential tenant, known as W.B. Cody's family restaurant (Cody's). He found a potential site located at Berlin Road, Cromwell, Connecticut consisting of a lot and a vacant building (the Property) owned by the Plaintiffs. Defendant requested real estate broker Lee Pollock of The Pollock Company (Pollock) to identify the owner and investigate whether the property was available for sale.
Defendant did not look at or inspect the Property prior to instructing Pollock to make an offer to Robert Tulisano (Robert). In his business Defendant routinely included a so-called "due diligence" period during which the potential property defects may be investigated.
On May 13, 1996, Robert signed a listing agreement (Agreement) with Pollock. Under the Agreement the Buyer was allowed to investigate the property and it required the parties to enter into a purchase and sale contract (Contract) which would include the terms and conditions set forth in the Agreement. The Agreement required the Buyer to deposit the sum of $40,000 into an interest bearing account and further provided that if the Buyer, Defendant, terminated the Contract, as allowed by its terms, the deposit, with interest, was to be returned to the Buyer.
When the Agreement was executed the Property was not on the market for sale and was being foreclosed by a mortgage holder. CT Page 3948
On May 17, 1996, Defendant, as president of Albemarle Equities, Inc., and Robert and Richard Tulisano (Richard) entered into the Contract, entitled "Real Estate Sales Contract," for the Property. The Contract set a purchase price of $400,000 and required the Defendant to deposit $40,000 with the Defendant's attorney, Kevin Dubay (the Stakeholder) "to be held in escrow by the Buyer's attorney in an interest bearing account for the benefit of the Buyer." That deposit was to be credited to the final purchase price at the time of the closing which was set for July 17, 1996. The Contract also contained six contingencies which are as follows:
 A. Buyer receiving a written building inspection report by a recognized or licensed Building Inspector indicating that the buildings located on the property are structurally sound and that the mechanical, plumbing and electrical systems of the buildings are functioning properly and are in good repair. The inspection report shall be completed at Buyer's expense. If the report reveals that any of the buildings located on the property are not structurally sound or that the mechanical, electrical or plumbing systems of any of the buildings are not functioning properly or are not in good repair, then Buyer shall immediately notify Seller and provide Seller with a copy of such report. Buyer may then terminate this Contract by giving written notice to Seller on or before 30 days after Contract is fully executed unless Seller elects to repair said defects at Seller's own expense. If Buyer terminates this Contract pursuant to this paragraph, then all sums deposited by Buyer shall be returned to Buyer, and neither party shall have any obligation to the other under this Contract. If Buyer does not terminate this Contract under this paragraph, Seller shall have not [sic] responsibility for the cost of such repairs. In consideration of the right of inspection, whether Buyer exercises such a right or not, Buyer hereby releases Seller, Broker and Co-Broker (if any) from any and all liability related to any defects in the property of which Seller, Broker and Co-Broker, as the cases may be, had no actual knowledge before the execution of this Contract.
 B. The property being in compliance with all applicable laws, ordinances and regulations (including zoning and environmental laws).
C. Seller will provide Buyer and Buyer's agents with CT Page 3949 access to the Property to perform the necessary tests and inspections and will cooperate in conducting such test, investigations, and applications for governmental approvals. Buyer shall promptly advise the Seller of any unsatisfactory condition of the property discovered as a result of such inspections and tests.
 D. Buyer's reasonable satisfaction as to the adequacy, feasibility, legality and enforceability of the cross easements pertaining to the property, which shall include execution by Cromwell Commons Associates or its successors of an estoppel.
 E. Seller will provide an A-1 survey to the Buyer within twenty (20) days from date of signing this contract. Such survey shall be dated within the last six (6) months.
 F. Performance of this agreement by Buyer is expressly conditioned upon Buyer obtaining an inspection and written report by a certified pest control inspector certifying that all buildings on the property are free from infestation and/or damage by termites or any other wood destroying pests. The inspection and written report shall be obtained by Buyer at Buyer's sole cost and expense on or before 30 days after Contract is fully executed. In the event that the written report thus obtained discloses any infestation and/or damage by termites or any other wood destroying pests, Buyer may terminate this Agreement by giving written notice of such termination to Seller within seven (7) days of the inspection. In such event, Seller shall have the option to cause the extermination of such pests and/or repair the damage as noted in the written report at his own cost and expense or to terminate this agreement by giving written notice of such termination to Buyer within five (5) days of Seller's receipt of the written report. In the event that either Buyer or Seller shall terminate this Agreement as aforesaid, then all monies paid hereunder shall be returned forthwith to Buyer and this Agreement shall be null and void.
Shortly after he signed the Contract, Defendant hired John Wilcox, an architect, and Glenn Chalders, a land use planner, to inspect and evaluate the Property to determine its physical condition and its viability for meeting the requirements of a Cody's restaurant. Robert was at the Property at the time of the inspection on June 11, 1996 and opened its doors to the building for inspection purposes. At the time of the inspection, there was CT Page 3950 about two to three feet of water in the basement of the building, the power to the building was off and the electrical, plumbing, heating and air conditioning systems were not in operation. Robert confirmed that there was two or three feet of water in the basement and that the electrical, plumbing, heating and air conditioning systems were not functioning as the power was shut off due to the property being vacant for at least six months.
After inspecting the property Wilcox rendered a report to Defendant dated June 14, 1996. During his inspection, Wilcox found evidence of water damage, including soft spots in the wood and siding of the building. Wilcox also found that some interior construction was completed without the necessary building permits from the Town of Cromwell. He also found that there were insufficient parking spaces to meet the needs of the proposed restaurant and the location of the building and configuration of the lot was less than ideal for the proposed use of the property. Wilcox concluded, in his report, that significant consideration should be given to the demolition and removal of the building from the site and building a new structure. At no time after the inspection did Robert, Richard or any other representative of the Sellers contact the Buyer or his representative indicating that the water in the basement had been removed, that the power was restored or that all mechanical and electrical systems were made operational. In addition, neither Defendant nor Wilcox received any requests from the Sellers to come back and reinspect the property.
The Contract was contingent upon the Buyer receiving an inspection report from a recognized building inspector stating that the building was structurally sound and that the mechanical, plumbing and electrical systems of the building are functioning properly and are in good repair, but not in regard to its suitability for a Cody's restaurant. Defendant never received such a report. The report he did receive found that the building systems were not operational and there was evidence of water damage.
The Contract was executed on May 17, 1996. On June 17, 1996, the parties orally agreed to extend the contingency in regard to inspections from June 17, 1996 to June 19, 1996. The extension agreement was signed on June 18, 1996 by Attorney Alfred Onorato (Onorato), on behalf of the Sellers, and on June 14, 1996 by Attorney Kevin Dubay, on behalf of the Defendant. CT Page 3951
Although the Sellers claim the contingency period ended on June 16, 1996, 30 days from the execution of the contract, at no time prior to trial was the timing of Buyers' termination notice raised as an issue.
Attorney Dubay testified that he represented the Defendant during the negotiations and that he dealt directly with Onorato who represented both Richard and Robert. Attorney Dubay's file reflected a communication with Onorato as early as May 30, 1996. The phone message slip from Attorney Dubay's file, dated May 30, 1996, confirms that Onorato then represented both Tulisanos. Robert's deposition testimony concedes that Onorato at least represented him on June 17, 1996. Onorato's letter to Attorney Dubay dated June 20, 1996 confirms that he is then "the attorney for the Sellers."
The Court following the Rules of Professional Conduct for Lawyers as found in the Connecticut Practice Book § Rule 1.1 et seq., notes that the rules require the lawyer to "abide by a clients' decisions concerning the objectives of representation, subject to subsections (c), (d) and (e) and shall consult with the clients as to the means by which they are to be pursued." Rule 1.2. The Court infers that because Attorney Onorato is admitted to the Connecticut Bar that he will follow those rules and do only what he is authorized to do including signing the extension agreement.
Prior to sending the termination letter, Defendant contacted Robert by phone and told him of the problems in the report and of his intention to terminate the contract. During this conversation with Defendant, Robert spoke of some restructuring of the transaction at a lower price. Robert requested Defendant's assistance in negotiating a lower commission with Pollack.
On June 19, 1996, Defendant sent the termination letter, by facsimile transmission, to Robert, Richard, Onorato, Attorney Dubay and Tony Carbone and also by mail to Robert. All of these fax transmissions went through. On June 21, 1996, Attorney Dubay received a faxed letter from Onorato, dated June 20, 1996, confirming receipt of the notice of termination from Schonberger and registering his objection as to the basis for the termination.
On July 16, 1996, Attorney Dubay wrote to Onorato confirming the termination of the contract by Schonberger for the reasons CT Page 3952 set forth in Schonberger's June 19, 1996 termination letter. It also complained about Sellers' failure to provide an A-1 survey and the estoppel certificate. That letter also pointed out the building code violations and that the mechanical, plumbing and electrical systems were not operable.
Pursuant to the terms of the Contract, the closing was scheduled for July 17, 1996, the day after Attorney Dubay' s letter.
Defendant never received an estoppel certificate or a current A-1 survey from the Sellers, nor did they confirm to Defendant that they had an updated A-1 survey or the estoppel certificate in regard to the cross-easements. They also never said that the power was restored and that electrical and mechanical systems were operable. Whether we find the extension valid or not, the termination letter was sent to and received by facsimile by Richard, Robert and their attorney Onorato on June 19, 1996.
The termination letter terminated the relationship of the parties and made Buyer entitled to the return of his deposit.
It is true that the termination letter of June 19, 1996 refers specifically to "Paragraph 4A". It is that subparagraph that provides for the thirty day limit for termination by the Buyer. However, there are five other subparagraphs among which is subparagraph 4E which also allows for termination. In addition subparagraph 4F, in regard to pest infestation, requires Buyer the time to obtain a pest report within "30 days after the Contract is fully executed." It then provides for an additional seven days after Buyer receives the pest report and the Sellers five more days to decide if they will repair any noted damage. As to title, Sellers are given thirty days after the closing date of July 17, 1996 to perfect title. From all of this the court concludes that the thirty day limit in 4A does not set the notice requirements for the entire paragraph and that parties did not intend to make time of the essence in the Agreement or Contract. The rule is "that time is ordinarily not of the essence in transactions involving real estate applies to the occurrence of a contractual condition as well as to the performance of a contractual duty." Kakalik v. Bernardo, 184 Conn. 386, 393. Here time was not of the essence.
Plaintiffs' failure to deliver the survey has only a "reasonable time limit" for notice of termination for that CT Page 3953 failure. Sternberg v. Infante, 13 Conn. App. 473, 476. The notice of termination was given within a reasonable time.
Judgment for defendant on first action and that stakeholder in second action deliver the deposit, with interest, to Philip Schonberger d/b/a Albermarle Equities, Inc.
O'Neill, J.